# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 454 | **DATE** | 3/31/2003 |
| CASE TITLE | The Chamberlain Group, Inc. vs. Lynx Industries, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry]  Enter Memorandum Opinion and Order. Lynx's motion for summary judgment of non-infringement (Doc. No. 87-1) is denied, and Chamberlain's cross-motion of infringement (Doc. No. 93-1) is also denied.

(11) ☒ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **number of notices** | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 3 1 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 122 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | 3/31/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| | | courtroom deputy's initials | U.S. DISTRICT COURT  03 MAR 31 PM 3:10 | ETV  mailing deputy initials | |
| | | | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE CHAMBERLAIN GROUP, INC., a Connecticut Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 00 C 454 |
| LYNX INDUSTRIES, INC., a Canadian Corporation, and NAPOLEON SPRING WORKS, INC., an Ohio Corporation, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

MAR 3 1 2003

## MEMORANDUM OPINION AND ORDER

The patent at issue in this case addresses a concern for families who own two, three or even more cars: How does each driver get into the multiple-car family garage? The parties are competitors in the market for electronic garage door openers which open automatically in response to a coded signal from a transmitter. Defendants market remote garage door openers that recognize up to six different codes and permit users to program up to six separate transmitters. Plaintiff Chamberlain Group ("Chamberlain") claims Defendants' product infringes Plaintiff's own patented system for storing multiple transmitter codes.

Chamberlain originally filed this action on January 24, 2000, charging Defendant Lynx Industries and Napoleon Spring Works (collectively "Lynx") with infringing two of Chamberlain's patents: Patent Number Re. 35,364 ("the `364 Patent") and Patent Number Re. 36,703 ("the `703 Patent"). Plaintiff later withdrew the count related to the `703 Patent, however, and for the purposes of this opinion, the court will only consider the parties' arguments related to the `364 Patent. (See Chamberlain v. Lynx, 00 C 0454, Minute Order of August 15, 2002.)

Both the `364 Patent, issued to Chamberlain on October 29, 1996 and the `703 patent, issued on May 16, 2000, are reissues of Patent Number 4,750,118 ("the `118 Patent"), which issued on June 7, 1988. All three patents describe a "Coding System for Multiple Transmitters

/22

and a Single Receiver for a Garage Door Opener." The inventions described in the `364 and `703 Patents provide for a garage door opener that is able to store multiple transmitter codes in one receiver, thereby allowing the same garage door opener to be activated by a number of different transmitters. Although claims 1-4 of the `364 Patent and the `703 Patent are identical, the remaining claims of the two patents vary. In addition, the scope of the `703 patent is much broader; the `703 patent contains 30 claims, while the `364 Patent has only eight claims.

Chamberlain claims that the Lynx garage door openers store codes in a manner that either literally infringes the patented invention or operates as its equivalent. Lynx contends it does not infringe because (1) the Lynx garage door opener stores transmitter codes in a substantially different manner than the patented invention and (2) unlike the patented invention, the Lynx garage door opener does not require a "decoder" device. Both sides have moved for summary judgment on the infringement issues and, for reasons explained here, both motions are denied.

## FACTUAL BACKGROUND

The court compiled the facts for this section from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts and attached exhibits.[1] As described below, these statements reflect a number of factual disputes. The court notes, further, that the Federal Circuit has previously addressed claims 1 and 5 of the `364 Patent in *Overhead Door Corp. v. The Chamberlain Group, Inc.*,194 F.3d 1261 (Fed. Cir. 1999), a declaratory judgment action filed by another alleged infringer. The court presumes the reader's familiarity with that decision.

---

[1] Both parties have filed motions to strike many of the other side's responses to assertions made in the parties' 56.1 Statements of Material Facts. The court has addressed these motions in a separate order. The court notes that both parties have included a number of documents in the record that are not discussed by the court in this background section. For instance, Chamberlain has presented copies of several other patents. Lynx has included a brief filed by Chamberlain in the *Overhead Door* case and the source code for the Lynx garage door opener. Although the court has reviewed the entire record, only that information relevant to the resolution of the parties' motions has been included in this section.

## A.    The Parties

Plaintiff Chamberlain is a Connecticut corporation with its principal place of business in Elmhurst, Illinois. (Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment of Non-Infringement ¶¶ 1-2) (hereinafter, "Lynx 56.1").) Chamberlain is in the business of manufacturing and selling garage door openers that are designed for both the commercial and residential markets. (*Id.*) Lynx Industries is a Canadian corporation with its principal place of business in Archbold, Ohio. (*Id.* ¶ 4.) Co-defendant, Napoleon Spring Works, is a subsidiary of Lynx Industries and is an Ohio corporation that also has its principal place of business in Archbold, Ohio. (*Id.* ¶ 5.) Lynx claims that it is primarily engaged in the business of selling residential and commercial garage door hardware, a claim disputed by Chamberlain for unspecified reasons. It is undisputed, however, that Lynx markets and sells electronic garage door openers that have the capability of storing multiple transmitter codes in a single garage door opener. (*Id.* ¶ 115; Chamberlain's Statement of Additional Facts, (hereinafter, "Chamberlain's 56.1"), ¶¶ 25-27.)

## B.    Disputed Claims

As described in the `364 Patent, the patented invention is capable of storing and remembering a number of different transmitter codes, thus allowing the same garage door opener to be activated by different transmitters, each with a unique code. (The `364 Patent, Abstract, LX 0001.) In claims 1 and 5, the `364 Patent describes a specific process for storing these codes. The issue before the court is whether the Lynx garage door opener, which is also capable of storing and remembering a number of different transmitter codes, uses a process to store codes that infringes the `364 Patent.

Although the `364 Patent includes eight claims, the parties' dispute focuses on whether the Lynx accused garage door opener infringes independent claims 1 and 5 of the `364 Patent, which

3

detail the process by which multiple transmitter codes are stored in the memory of a single garage door opener. Specifically, claim 1 states:

> A garage door operator for a garage door comprising, a garage door operation mechanism with an output shaft connected to said garage door to open and close it, a radio receiver, a *decoder* connected to receive the output of said radio receiver, a microprocessor connected to receive the output of said *decoder* and to said garage door operation mechanism to energize it, a switch moveable between program and operate positions connected to said microprocessor to place said microprocessor in the operate or program mode, a memory means for storing a plurality of addresses connected to said microprocessor when said switch is in the program position, *a memory selection switch* connected to said microprocessor, a plurality of radio transmitters with different *codes*, said memory selection switch setable in a first position at a time when a first one of said radio transmitters is energized so that the *code* of said first transmitter will be stored in said memory means and said *memory selection switch* set in a second position at a time when a second one of said radio transmitters is energized so that the *code* of said second transmitter will be stored in said memory means, and said microprocessor placed in the operate mode when said switch is in the operate position so that either or both of said first and second radio transmitters when energized cause said microprocessor to energize said garage door operator mechanism.

(The `364 Patent, col. 5, lines 11-35) (emphasis added).

Lynx maintains that the accused device does not infringe claim 1 because Lynx's garage door opener does not utilize a "memory selection switch" or a "decoder" device in storing transmitter codes. (Lynx Memorandum in Support of Motion for Summary Judgment of Non-Infringement, (hereinafter, "Lynx Memo"), at 33.) As will be explained in more detail below, the memory selection switch in claim 1 describes a mechanical switch for storing transmitter codes in different memory locations. Although Chamberlain acknowledges that the Lynx garage door opener utilizes a software program rather than a mechanical switch to store codes, it maintains that the accused device stores transmitter codes into the memory of the garage door opener in an equivalent fashion to that set out in claim 1. (Chamberlain Memorandum in Opposition to Lynx's Motion for Summary Judgment of Non-Infringement and in Support of Summary Judgment of Infringement, (hereinafter, "Chamberlain's Memo"), at 15.)

The parties also dispute the proper construction of two terms in claim 1: "code" and "decoder." Lynx claims that the term "code" refers only to a newly received code that is to be

stored in a memory location rather than to any previously stored code. (Lynx Memo, at 9.) Lynx maintains that the accused product stores newly received codes in the same memory location each time, while the patented invention operates to store new codes in different memory locations. Chamberlain disputes Lynx's construction of the claim terms and argues that, as properly construed, the term "code" means simply "the identity code of the transmitter"; an identity code, according to Chamberlain, is a "numerical value used to identify a transmitter." (Chamberlain's Memo, at 20-21.)

Lynx also claims that its accused device does not utilize a "decoder" device as contemplated by the '364 Patent. According to Lynx, the decoder device described in the '364 Patent is a "stand-alone" device that converts codes from quaternary format to binary format before sending this converted code to the microprocessor. (Lynx Memo, at 22.) Lynx points out that quaternary code format allows for far more unique codes than binary format, rendering quaternary format superior to binary. (Id. at 25.) Lynx maintains that the accused device does not have a "stand-alone" decoder, nor does the device convert a quaternary signal into binary format. (Lynx Memo, at 45.) Instead, according to Lynx, the accused device only utilizes binary format and sends a received code directly to the central processing unit, without going through a separate "stand-alone" decoder. (Id.)

Chamberlain disputes this construction of "decoder" and contends that the term is properly understood as a "subsystem which can receive the output of the radio receiver and convert it into a form wherein the data contained in the received transmissions can be interpreted by the microprocessor." (Chamberlain Memo, at 29.) Chamberlain claims further that the Lynx garage door opener does utilize a "decoder" device or its equivalent to convert an analog signal into a digital format. (Id. at 32.) According to Chamberlain, the analog signal is transmitted by a transmitter, and at some point after this analog signal is received by the Lynx garage door opener, it is converted into a digital signal by a device Chamberlain refers to as an "operational amplifier,"

5

which allows the device to store codes and operate the garage door. (Chamberlain Memo, at 32-33; Supplemental Declaration of Dr. Thomas Rhyne, (hereinafter, "Rhyne Suppl. Decl."), 15-16.) Chamberlain has not argued that the "decoder" device in the `364 Patent converts an analog signal into a digital signal, but nevertheless maintains that the "operational amplifier" performs the same function as the "decoder" device in the `364 Patent.

The parties also dispute whether the accused device infringes claim 5 of the `364 Patent. Claim 5, similar to claim 1, describes a procedure for storing transmitter codes into the memory of the garage door opener. Claim 5, however, encompasses a software embodiment of the memory selection switch. Specifically, claim 5 of the `364 Patent states:

> An operator for controlling operation of equipment comprising: a radio receiver, a *decoder* connected to receive the output of said radio receiver, a microprocessor connected to receive the output of said *decoder* and to said equipment to energize it, first switch means for selection between program and operate positions connected to said microprocessor to place said microprocessor in the operate or the program mode, a memory means for storing a plurality of addresses connected to said microprocessor when said first switch means is in the program position, a *memory selection second switch means* connected to said microprocessor, a plurality of radio transmitters with different *codes*, said *memory selection second switch means* being adapted to select a first position at a time when a first one of said radio transmitters is energized so that the *code* of said first transmitter will be stored in said memory means and said *memory selection second switch means* being adapted to select a second position at a time when a second one of said radio transmitters is energized so that the *code* of said second transmitter will be stored in said memory means, and said microprocessor placed in the operate mode when said first switch means is in the operate position so that either or both of said first and second radio transmitters, when energized cause said microprocessor to energize said equipment.

(The `364 Patent, col. 6, lines 7-30) (emphasis added). The parties' dispute regarding the construction of "code" and "decoder" is the same here as in claim 1. In claim 5, the parties also dispute the proper construction of the claim term "memory selection second switch means," which represents the software embodiment of the memory selection switch. Lynx asserts that its accused device does not infringe claim 5 because it lacks a "decoder" device and because it lacks a structure that infringes the "memory selection second switch means" claim element. Chamberlain maintains that the structure utilized by the Lynx garage door opener is the same or equivalent to

6

that described in claim 5.

The issue of infringement related to the "memory selection second switch means" is more complicated than the "memory selection switch" element in claim 1. Both sides agree that this term is drafted as a means-plus-function element, under 35 U.S.C. § 112, ¶ 6.[2] Once established that a term is written as a means-plus-function limitation, the court must interpret this limitation by deciding what the claimed function is, and next, what structures disclosed in the specifications correspond to the "means" for performing the function. *Cardiac Pacemakers Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). The parties agree that the function of this claim element is "to select different memory locations, thereby enabling the microprocessor to store transmitter identifiers in the memory locations." *Overhead Door Corp.*, 194 F.3d at 1273. The parties, however, dispute the proper corresponding structure. Their contrasting views will be described in more detail in the discussion section of this opinion.

C. **Prior Litigation Involving the `364 Patent**

In August 1995, Overhead Door Corporation and GMI Holdings, Inc. (collectively, "Overhead") brought a declaratory judgment action in the United States District Court for the Northern District of Texas, alleging non-infringement of Chamberlain's original patent, the `118 Patent. Chamberlain counterclaimed for a declaration of infringement. (*Overhead Door Corp. v. The Chamberlain Group, Inc.*, 3:95 CV 1648-D, at 1 (April 30, 1998 N.D. Tex.), Ex. 4 to Chamberlain's 56.1.) When the `364 Patent reissued, during the litigation, it was added to the litigation. (*Id.*)

On April 30, 1998, the district court concluded that Overhead's software system used to

---

[2] Section 112, ¶ 6 provides:
An element in a claim for combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof
35 U.S.C. § 112, ¶ 6.

store transmitter codes into memory literally infringed the "different code" limitations of independent claims 1 and 5, but granted Overhead's motion for summary judgment on the software infringement claim, concluding that the "memory selection switch" of claim 1 and the "memory selection second switch means" of claim 5 do not cover a software embodiment. (*Id.* at 2-3; Special Master's First Report and Recommendation on Overhead's Motion for Summary Judgment of Non-Infringement and Chamberlain's Cross-Motion for Summary Judgment of Infringement, Ex. 2 to Chamberlain's 56.1, at 1; Special Master's Second Report and Recommendation on Overhead's Motion for Summary Judgment of Non-Infringement and Chamberlain's Cross-Motion for Summary Judgment of Infringement, Ex. 3 to Chamberlain's 56.1.)

On October 13, 1999, in *Overhead Door Corp.,* 194 F.3d at 1275, the Federal Circuit Court of Appeals vacated that order. (Chamberlain's 56.1 ¶ 14.) The Federal Circuit concluded that the `364 patent must be construed to disclose a software embodiment. (*Overhead Door Corp.,* 194 F.3d at 1272-73.) The Court of Appeals affirmed the district court's ruling that as a matter of law, the accused garage door opener did not literally infringe as to claim 1, as it did not have a mechanical switch. The Federal Circuit concluded, however, that the district court erred in granting summary judgment for plaintiff because there was a genuine issue of fact regarding whether Overhead's accused garage door opener did infringe the "memory selection switch" of claim 1 of the `364 Patent pursuant to the doctrine of equivalents; and whether the accused garage door opener was equivalent to the "memory selection second switch means" of claim 5 under 35 U.S.C. § 112, ¶ 6. (*Id.* at 1271-73.) Because there was an issue of fact to resolve, the court did not grant Chamberlain's cross-motion for summary judgment. (*Id.*) The court did, however, affirm the district court's finding that as a matter of law the accused garage door opener literally infringed the"different codes" limitations of claims 1 and 5. (*Id.* at 1275.)

After the Federal Circuit issued its opinion and before the trial, Overhead and Chamberlain entered an agreement, which became effective on January 1, 2001, granting Overhead a license

to the `364 Patent. (Settlement and License Agreement, Ex. 6 to Chamberlain's 56.1.)

**D.     How Does the Patented Invention Operate?**

The patented invention is comprised of several components, including a transmitter, receiver, decoder, and microprocessor. (The `364 Patent, col. 3, lines 1-7; Figure 2, LX 0003.) The transmitter is a small box-like device that users typically keep in their car. (The 364 Patent, Figure 2, LX 0003.) Each transmitter contains a unique code that is transmitted via radio frequency to the garage door opener when the user presses the button located on the transmitter. (The `364 Patent, col. 1, lines 44-49; col. 3, lines 1-4.)   This unique code is then received by the receiver, which supplies an input to a decoder, which in turn sends an output to the microprocessor of the garage door opener. (The `364 Patent, col. 3, lines 1-5.) The microprocessor is also connected to the motor that enables the garage door to move up and down. (The `364 Patent, col. 3, lines 5-10.)  Each of these components function to allow the patented invention to store codes into memory and to move the garage door up or down. (The `364 Patent, col. 3, lines 40-59.)

Both sides agree that the patented invention has two different modes: program and operate. (Chamberlain's 56.1 ¶ 19.)  The program mode allows the patented invention to store up to five transmitter codes into the memory of the patented invention, while the operate mode allows the patented invention to verify that a received code matches one of the previously stored codes, prior to moving the garage door up or down. (*Id.*)  To alternate between these two modes, the patented invention includes a mechanical switch, depicted in Figure 2 of the `364 Patent, which allows a user to shift between the program and operate modes. (*Id.*; The `364 Patent, Figure 2, at LX 0003.) At least one transmitter must be stored into the memory of the patented invention before the garage door can be remotely activated. (The `364 Patent, col. 3, lines 40-50.)

In order to store transmitter codes in the five different memory locations, the patented invention includes a mechanical "memory selection switch," described in claim 1 and depicted in

Figure 2, capable of selecting one of the five different memory locations.[3] (The `364 Patent, col. 4, lines 56-62.) In claim 5, the `364 patent also encompasses a software embodiment of the memory selection switch. (Chamberlain's 56.1 ¶ 20.)

The `364 Patent specifications describe in detail how the mechanical memory selection switch operates to store codes into its five different memory locations. (The `364 Patent, col. 3, lines 41-59.) Once the device is in the program mode, the user stores a code into the memory by pressing the transmitter button, which transmits a unique code to the receiver of the patented invention. (The `364 Patent, col. 3, lines 40-49.) This code is then "received by the receiver [of the patented invention] and decoded by the decoder . . . and supplied to the microprocessor unit . . . ." (*Id.*) At this point, if the mechanical memory selection switch is set to position one, the code will be stored in the corresponding first memory location. (*Id.*) An additional four codes can be stored in this manner by following the same procedure and alternating the mechanical memory selection switch between positions two through five. (*Id.*) In the event all five memory locations are occupied, while a new code is being stored, "all old codes" are erased when this new code is stored. (The `364 Patent, col. 4, line 65 - col. 5, line 5.) Thus all five previously stored codes would be erased, when a user stores a sixth code.

The court notes that the language contained in the specifications of the `364 Patent does not expressly describe the software memory selection switch. As stated above, however, the Federal Circuit has examined the `364 Patent and determined that Claim 5 encompasses a software memory selection switch as evidenced by Figure 3 of the `364 Patent. *Overhead Door Corp.,* 194 F.3d 1261 at 1273. This court is similarly persuaded that Figure 3 depicts a software embodiment. Significantly, both sides agree that the `364 Patent includes a software embodiment

---

[3]     A copy of Figure 2 is attached as an appendix to this opinion.

that is, in some manner, depicted in Figure 3.[4]  (Lynx Memo, at 15-16; Chamberlain Memo, at 22-23.)

According to the specifications of the `364 Patent, Figures 3 and 4 illustrate a flow chart that depicts the operation of the patented invention while in the program and operate modes.  (The `364 Patent, col. 4, lines 23-25.)    Lynx disputes that Figure 3 depicts the operation mode of the patented invention and instead claims that Figure 3 as a whole serves as the corresponding structure for the "memory selection second switch means" element contained in claim 5.   (Lynx Memo, at 15-16.)

Although the parties disagree over the significance of Figure 3, both sides agree that the flow chart depicts a six-step process followed by the patented invention to store codes.  (Lynx Memo, at 17; Chamberlain Memo, at 27-28.)  These steps are followed when the garage door opener is in the program mode and a transmitter button has been pressed.  (The `364 Patent, col. 4, lines 56-62.)  Specifically, the six steps depicted in Figure 3 are: (1) validating newly received transmitter codes four times and incrementing a counter; (2) checking each newly received code against previously stored codes; (3) selecting a memory location for the newly received code; (4) incrementing a code location pointer; (5) checking the value of the incremented code location pointer; and (6) resetting the value of the incremented code location pointer.  (Lynx Memo, at 17; Chamberlain Memo, at 27-28.)

The court notes that the parties do not provide any further explanation regarding the six steps, nor do the specifications of the invention explain the various steps as they appear in the flow chart.  To the extent the court understands the steps included in Figure 3, the court believes that in the first two steps, the patented invention compares an incoming transmitter code against all previously stored codes to insure that only different codes are stored into the memory of patented

---

[4]        A copy of Figure 3 is attached as an appendix to this opinion.

invention. In fact, these codes are checked four times to insure that the new code has not been previously stored into memory. In step three, as this court understands it, the software of the patented invention operates to select one of the five memory locations in which to store the transmitter code. The software then moves, in step four, to the next memory location in sequential order. Although the parties do not explain the term "increment" in relation to the patented invention, the court believes that incrementing the code location pointer means moving the pointer to the next memory location. The final steps relate to the operation of the software when all five memory locations are full. If the software discerns that it has filled the final memory location, it will reset and prepare to store a new transmitter code in the first location.

Lynx claims that all six steps included in Figure 3 make up the structure of the software memory selection switch, referred to in claim 5 as the "memory selection second switch means." (Lynx Memo, at 17.) Chamberlain denies this assertion and claims that only functions 3 and 4 serve as the corresponding structure for the "memory selection second switch means." (Declaration of Dr. V. Thomas Rhyne, Ex. 8 to Chamberlain's 56.1 ¶ 27 n.3) (hereinafter "Rhyne Decl.") The dispute between the parties is highly relevant to the issue of infringement. Lynx asserts that many of the steps listed in Figure 3 are not performed by the accused device and thus it does not infringe the patented invention. (Declaration of Thomas A. Gafford, Ex. O to Lynx's 56.1 ¶ 2) (hereinafter "Gafford Decl.").) Chamberlain does not claim that the Lynx garage door opener performs all six steps in storing codes into memory, but does allege that the Lynx software used to store codes performs steps 3 and 4. (Rhyne Decl. ¶ 29.)

Once the code is stored, both sides agree as to how the patented invention operates to remotely open or close a garage door. (Chamberlain's 56.1 ¶ 17.) When a transmitter button is pressed, a radio frequency containing the code is transmitted. (*Id.* ¶ 18.) This transmitted signal is received by the receiver of the patented invention, which in turn supplies an input to a decoder. (*Id.*) If the code matches a code previously stored in the patented invention, the decoder sends

an output directed to the microprocessor unit, which then activates the motor to move the garage door. (The `364 Patent, col. 3, lines 5-8.) When in the operate mode, the garage door opener will compare a received code four times against the previously stored codes to insure a match before moving the garage door. (The `364 Patent, col. 4, lines 25-28.)

As explained above, the parties also dispute the nature of the "decoder" device as described in claims 1 and 5. The decoder device, in conjunction with the receiver and microprocessor, plays a role in both the program and operate modes of the patented invention. (The `364 Patent, col. 3, lines 40-59.) When the patented invention is in the program mode, a code is decoded prior to being stored in the microprocessor of the patented invention. (The 364 Patent, col. 3, lines 44-49.) On the other hand, when the patented invention is in the operate mode, the receiver, decoder and microprocessor all function to determine whether a newly received code matches a stored code, prior to activating the garage door. (The `364 Patent, col. 3, lines 50-55.) The court notes that the specifications do not explain how the decoder functions to decode a newly received code, nor do the specifications dictate what format the received code is decoded into or from prior to being sent to the microprocessor.

The components of the patented invention, including the decoder, are depicted in "block form" in Figure 2 of the `364 Patent. (The `364 Patent, col. 2, line 42; Figure 2, at LX 0003.)[5] As depicted in Figure 2, the receiver, decoder and microprocessor unit are all stand-alone or separate devices, connected to one another. (*Id.*) Specifically, Figure 2 depicts the decoder as connected to both the receiver and the microprocessor. (*Id.*)

Figure 2 also identifies each component with a number that is later used, along with the name of component, in the written specifications to reference that component. The decoder device

---

[5] Neither the specifications nor the parties explain what "block form" means, but the court presumes that block form refers to a type of drawing in which components are not drawn to scale or in detail but instead are drawn as rectangles (or blocks), with the name of the component inside. (The `364 Patent, Figure 2, LX 0003.)

is provided the number 43 in Figure 2 and in many instances throughout the specifications, the decoder is referred to specifically as "decoder 43," referring to the component as depicted in Figure 2. (The `364 Patent, col. 3, lines 3-5; col. 3, lines 44-46.) Based on Figure 2 and the references to "decoder 43" throughout the specifications, Lynx maintains that Chamberlain intended the decoder to be a stand-alone device. The court notes, however, that the specifications also state that "[i]n the present invention the decoder module in the receiver will be capable of learning several different transmitted codes . . .", which provides some indication that the decoder is contained within the receiver. (The `364 Patent, col. 1, lines 54-56.)

E.      How Does the Lynx Garage Door Opener Operate?

In describing the accused device and how it compares to the `364 Patent, Lynx has relied on the opinion of a retained technical expert, Thomas A. Gafford. Gafford claims to have extensive education and experience in the areas of electrical engineering and software design. (Gafford Decl. ¶ 2.) He is a member of the Institute of Electrical and Electronic Engineers and the owner of Gafford Technology, a company that designs and manufactures computer peripheral switches using software design language, and also provides consulting services in computer system design and other areas. (Ex. 1 to Gafford Decl.) Prior to providing his opinion in this matter, Gafford reviewed the `118 Patent, the `364 Patent, and the `703 patent, as well as the corresponding prosecution histories. (Gafford Decl. at ¶ 3.) He also reviewed the Federal Circuit opinion in *Overhead Door Corp.*, 194 F.3d 1261.

Gafford concedes that many of the features of the Lynx garage door opener are the same as those presented in the patented invention. For instance, the Lynx garage door opener is remotely activated by transmitters that transmit a code when the transmitter button is pressed. (Gafford Decl. ¶ 5.) In the event that the transmitter code matches a code stored in the garage door opener's memory, the motor is energized to either open or close the garage door. (*Id.*)

Similar to the patented invention, before the Lynx garage door opener is operational, the receiver must be taught the code for at least one transmitter. (*Id.* ¶ 6.) The Lynx garage door opener can be alternated between the program and operate modes. (*Id.* ¶ 7.) While in the program mode, the Lynx garage door opener utilizes a software program that allows its receiver to store six transmitter codes in six different memory locations, designated as 0,1, 2, 3, 4, 5. (*Id.*)

Although the Lynx garage door opener shares certain features with the patented invention, Gafford nevertheless claims that the accused device does not infringe the patented invention because they have substantial differences. (*Id.* ¶ 15-23.) Specifically, Gafford points out that the the Lynx garage door opener utilizes a different process for storing multiple transmitter codes and does not utilize a "decoder" device similar to that used by the patented invention. (*Id.*)

According to Gafford, the accused device stores codes in a different manner than the patented invention because it does not contain a memory location switch of any kind. (*Id.* ¶ 14.) If the program button of the Lynx garage door opener is pressed, while the button of a transmitter is pressed, the code of this new transmitter is stored in location 0, or the first memory location. (*Id.* ¶ 7.) In fact, according to Gafford, when a new transmitter code is stored, it is always stored in memory location 0. (*Id.*) In the event one or more transmitter codes have already been stored, when a new code is being stored, each previously stored code is copied to the next higher location to enable the new code to be stored in location 0. (*Id.*) Thus, according to Gafford, the accused garage door opener does not contain or need a memory selection switch because each newly received code is always stored in the same memory location and old codes are then copied into a new location. (*Id.* ¶¶ 5-23.) The Lynx garage door opener software does not choose from two or more memory locations to store a newly received code. (*Id.* ¶ 16.)

Gafford also claims that the Lynx garage door opener does not need to follow the steps set forth in the flow chart in Figure 3 of the `364 Patent. (*Id.* ¶¶ 17, 21, 22.) Gafford claims that the Lynx software does not compare newly received codes against previously stored codes to insure

that only different codes are stored. (*Id.* ¶ 22.) Instead, according to Gafford, the Lynx garage door opener is capable of storing the same code six times. (*Id.* ¶ 23.) In addition, because the Lynx garage door opener does not include a memory selection switch, the accused device does not need to increment a code location pointer or to determine whether that pointer is at the last memory location requiring the pointer to be reset to the first memory location. (*Id.* ¶ 21.) According to Gafford, unlike the patented invention, if all the memory locations are filled, at the time a new code is being stored, the Lynx garage door opener overwrites the oldest code in the highest memory location, with the second oldest code at the time the new code is stored, rather than erasing all previously stored codes. (*Id.* ¶ 20.) Gafford refers to this system of storing codes as a first-in, first out, or FIFO system, which is different than that used by the patented invention. (*Id.* ¶ 13; Gafford Supplemental Decl. ¶ 6.)

Lastly, Gafford claims that the Lynx garage door opener does not require a "decoder" as contemplated by claims 1 and 5. Specifically, Lynx claims that the decoder in the patented invention is intended to be a "stand-alone" device and it functions to convert a quaternary signal into binary format. (Lynx Memo, at 22.) Neither party has explained the necessity for converting a quaternary format to a binary format, but Lynx points out that the use of quaternary format allows for over 1 million unique codes, whereas binary format allows for only 1024 unique codes. (*Id.* at 25.)

F.    **Chamberlain's Description of the Operations of the Accused Device**

Chamberlain likewise has relied almost exclusively on a retained expert to provide a comparison of the patented invention to the Lynx garage door opener. Chamberlain's expert, Dr. V. Thomas Rhyne, claims to have extensive education and experience in the areas of electrical engineering. (Rhyne Decl. ¶ 1.) He has taught and practiced in the area of electrical engineering for almost forty years, which has included serving as a consulting engineer in the areas of

16

computer system design, application-specific system design and expert witness work in intellectual property litigation. (*Id.* ¶¶ 1, 6.) Rhyne reviewed the documents relevant to this case prior to providing his opinion. (*Id.* ¶¶ 10-11.)

Rhyne's opinion of how the Lynx garage door opener operates contradicts Gafford's description.[6] Contrary to Lynx's expert, Chamberlain asserts that the Lynx garage door opener and the patented invention are quite similar because they both utilize a "stack" procedure for storing memory codes. (*Id.* ¶¶ 15, 30.) The only difference, according to Rhyne, is that the patented invention stores new codes at the top of the stack and leaves previously stored codes in the same position, whereas the Lynx garage door opener stores the new codes in the lowest position on the stack and then moves the previously stored codes to higher memory locations. (*Id.*)

In order to move these codes to different locations, Rhyne states that the Lynx software utilizes a memory location pointer that "performs exactly the function" of the memory selection switch. (*Id.* ¶ 17.) The software code location pointer of the Lynx system, according to Rhyne, acts as a stack pointer when selecting an address within the memory locations of the accused device. (*Id.* ¶ 21) The purpose of the code location pointer is "to select memory locations" to store transmitter codes. (*Id.* ¶ 17.) In addition, the pointer value functions to store "codes in different memory locations." (*Id.*)

Chamberlain concedes that the Lynx garage door opener does not include a mechanical switch. Nevertheless, Chamberlain insists that the Lynx product infringes, because, at the time the '364 Patent was filed, the interchangeability of hardware and software was well known. (*Id.* ¶ 30.)

---

[6]     Lynx objects to Chamberlain's use of Rhyne's declaration in this matter because it is an opinion and thus not proper under Local Rule 56.1(a)(3), which requires facts. The court is puzzled by this objection; as explained above, Lynx itself has relied heavily on its own expert Gafford in drafting its 56.1 Statement. Lynx has not explained its apparent belief that Gafford offered "facts" while Chamberlain's expert presented merely "opinions." Nor has Lynx provided any other legal basis for disregarding this evidence under the local rules. The court will consider Rhyne's declaration along with the rest of the record.

Thus, according to Chamberlain, the decision to use a hardware or software switch is a designer's choice. (*Id.* ¶ 18.) Both sides agree that the use of semiconductor elements, such as transistors, as switches, was well known in the computer art at the time the `364 Patent was filed. (Chamberlain's 56.1 ¶ 31.) Both sides agree, further, that a mechanical device can serve as an equivalent to a software program, but they dispute whether the mechanical switch in claim 1 stores codes in a substantially equivalent manner to the Lynx software.

Chamberlain claims that the software embodiment of the memory selection switch is also infringed by the Lynx garage door opener. (Rhyne Decl. ¶¶ 29-34.) According to Rhyne, the process depicted in Figure 3 of the `364 Patent also operates as a stack for storing codes. (*Id.* ¶ 30.) Thus, for the reasons stated above, Rhyne believes Figure 3 and the software utilized by the Lynx garage door opener use similar structures for storing codes. Chamberlain maintains that it is irrelevant that the Lynx garage door opener does not perform a number of the steps depicted in the flow chart of Figure 3 because these additional steps are not related to the memory selection switch element described in claim 5. (*Id.* ¶ 27 n.3.) According to Rhyne, the software memory selection switch selects a memory location for the newly received code and increments the code location pointer. (*Id.* ¶ 30.) Rhyne maintains that this same function is performed by the code location pointer of the Lynx software used to store codes into memory. (*Id.* ¶¶ 27, 28.) According to Rhyne, the code location pointer of the Lynx software selects a first memory location to store the code of a first transmitter and then selects a second location when storing the code of a second transmitter. (*Id.* ¶ 34.) In Rhyne's opinion, the software structure used by the Lynx garage door opener literally infringes that used by the patented invention. (*Id.* ¶ 32)

Finally, Chamberlain claims that the circuitry of the Lynx garage door opener includes a separate, stand-alone device that is connected to and in electrical communication with both the receiver and microprocessor, which performs a decoding function similar to the patented invention.

(Rhyne Suppl. Decl. ¶ 12.)  Both sides agree that the circuitry of the Lynx garage door opener provides a sequence of amplifiers to increase the voltage of the analog radio frequency signal received from a transmitter. (Chamberlain's 56.1 ¶ 65.)   Both sides agree, further, that the Lynx receiver is connected to an "operational amplifier" that takes this amplified signal and converts it from an analog to a digital format. (Chamberlain's 56.1 ¶ 66)  Chamberlain characterizes Lynx's "operational amplifier" as a "decoder," and asserts that this device is a "a separate, stand-alone device that is connected to and in electrical communication with both the receiver and microprocessor" of the Lynx garage door opener.  (Rhyne Suppl. Decl. ¶ 16.)

Chamberlain urges that Lynx is attempting to construe the claim term "decoder" in a manner quite different from the ordinary meaning of the term.  Chamberlain points out that the term "decoder" is defined in Newton's Telecom Dictionary as "a device that converts information from one form to another – typically from analog to digital and vice versa." (Newton's Telecom Dictionary, Ex. 10 to Chamberlain's 56.1, at 210.)  In addition, the Standard Dictionary of Electrical and Electronics Terms, Third Edition, published by the Institute of Electrical and Electronics Engineers, Inc. ("the IEEE"), defines "decode" to mean: "(1) To recover the original message from a coded form of the message.  (2) To apply a code so as reverse some previous encoding." (The IEEE Standard Dictionary of Electrical and Electronics Terms, Ex. 12, at 231.)  Lynx disputes these definitions, claiming it is without knowledge or information sufficient to form a belief as to their accuracy.   The court notes, however, that the portions of the dictionaries have been accurately quoted in the record.  Chamberlain maintains that any device that performs this general decoding function infringes the "decoder" claim element.

## DISCUSSION

I.      **Standard of Review**

Summary judgment is warranted where "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990); *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Material facts are those that might affect the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disagreement between the parties regarding the meaning of a limitation in a patent does not necessarily create a genuine issue of material fact. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed. Cir. 1992). In a case like this one, where both sides have moved for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1364 (Fed. Cir. 2001). With these standards in mind, the court now addresses the parties' motions.

Both sides have moved for summary judgment on the infringement issue related to the `364 Patent. Determining whether or not a patent claim has been infringed is a two-step process. The court is required, first, to construe the meaning and scope of the claims; and second, to compare the properly construed claims to the accused device. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). The first step regarding claim construction is a question of law. *Id.* at 970-71. The second step, determining infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001).

II.     **Claim Construction**

As stated previously, the parties in this case dispute three claim terms in the `364 Patent: "code," "decoder," and "memory selection second switch means." The court will address each of these disputed terms in turn. In each instance, the court will examine the claim language itself, giving the terms "their ordinary and accustomed meanings as understood by one of ordinary skill

20

in the art." *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). It is a well settled principle of patent law that when "interpreting an asserted claim, the court should look first to the intrinsic evidence of the record," such as "the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), citing *Markman*, 52 F.3d at 979. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Id.* When intrinsic evidence is sufficient, it is inappropriate for the court to rely on extrinsic evidence. *Id.*

### A. "Code"

The claim term "code" is used throughout independent claims 1 and 5 of the `364 Patent. Lynx argues that "code" as properly construed means "newly received code that is to be stored in a memory location" rather than previously stored codes. Chamberlain, on the other hand, claims this construction is improper and that the term as properly construed means "the identity codes of the transmitters."

Lynx argues, first, that the term "code" was defined by implication in the written description because it is used in a manner consistent with only one meaning, "newly received codes." Although the general rule of claim construction is that "limitations from the specifications are not to be read into the claims," the Federal Circuit has explained that "the written description 'can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.'" *Bell Atlantic Network Services*, 262 F.3d at 1270-71, quoting *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed Cir. 2001). A patentee will be found to have defined a term by implication if the "patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning." *Id.* at 1270 (citations omitted).

Lynx directs the court to a number of provisions in the specifications to support its proposed claim construction, including: "wherein the receiver can be placed into a program mode wherein it will receive and store two or more codes corresponding to two different transmitters," (The `364 Patent, col. 1, lines 47-49); and "[i]n the program mode a code must be received four times in a row in order to be permanently stored in the receiver." (The `364 Patent, col 1, lines 17-19; col. 4, lines 34-37). The court recognizes that Lynx's proposed construction is consistent with these portions of the written description, but notes that it is not consistent with other portions. For instance, the specifications also state, "[i]n the invention, each transmitter . . . will have a unique code which is determined by the encoder chip contained in the transmitter," (The `364 Patent, col. 3, lines 31-33), and "[w]hen the garage door operator is initially installed, the switch . . . is moved to the program mode and the energize button . . . of the first transmitter . . . is depressed so that the unique code of the first transmitter is transmitted." (The `364 Patent, col. 3, lines 40-43.) Lynx's proposed claim construction does not comport with these portions of the written description. Because the court finds that the term "code" is used in a manner consistent with more than one meaning, the term has not been defined by implication.

Lynx also directs the court to certain statements made by Rhyne during the prosecution of the `703 Patent, which Lynx claims support its proposed claim construction. Chamberlain argues that statements made during the prosecution of the `703 Patent are not relevant to the claim construction of terms in the `364 Patent. The court notes that Lynx does not address Chamberlain's relevancy argument. In any event, the court does not need to resolve this dispute because it finds the Federal Circuit's decision in *Overhead Door Corp.* dispositive regarding the proper construction of the term "code."

To insure uniformity in the treatment of a patent, the court will rely on the Federal Circuit's claim construction related to claim terms in the `364 Patent. *Markman,* 517 U.S. at 390-9 ("[t]he limits of a patent must be known for the protection of the patentee, the encouragement of the

22

inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public.") In *Overhead Door Corp.*, 194 F.3d at 1274, the Federal Circuit considered the district court's construction of the "different codes" claim element in claims 1 and 5 of the `364 Patent. The district court construed this claim element to mean "factory-defined codes stored within the radio transmitters which uniquely identify each different transmitter and are not selectable or modifiable by the user of the garage door opener . . . system." *Id.* The Federal Circuit stated that the district court's claim construction was supported by both the claims and the written description of the `364 Patent. *Id.* ("The claim language requires association of each code with a different transmitter. The written description notes that each code uniquely identifies a transmitter.") The Federal Circuit stated, further, that "[t]he claim language does not supply any further constraints on the meaning of 'codes.'" *Id.*

Lynx proposes a claim construction, "newly received code", that associates the term "codes" with the storing process set forth in the `364 Patent. In this court's view, Lynx's construction is inconsistent with that of the Federal Circuit. In *Overhead Door Corp.*, the Federal Circuit indicated that a code is associated with a transmitter, whether it is in the process of being stored or not. *Id.* at 1274. Chamberlain's proposed claim construction, in contrast, does correspond with the Federal Circuit's construction, and associates the term "code" as it relates to each transmitter. In addition, Lynx's proposed construction seeks to impart additional constraints on the "code" element, counter to the Federal Circuit's direction that no further constraints were warranted. Because the court finds that Chamberlain's claim construction of "code" is consistent with the Federal Circuit's construction of the term "different codes," the court construes the term "code" in claim 1 and 5 to mean "the identity codes of the transmitters."

B.      **"Memory Selection Second Switch Means"**

Both sides agree that the Federal Circuit addressed the proper construction of the claim

23

term "memory selection second switch means," as it applies to claim 5 of the `364 Patent, in
*Overhead Door Corp.*, 194 F.3d at 1271-73. As explained previously, this claim term has been
drafted as a means-plus-function element, under 35 U.S.C. § 112, ¶ 6.[7] *Id.* at 1271. The court
must interpret this means-plus-function element by deciding, first, what the claimed function is, and
next, what structures disclosed in the specifications correspond to the "means" for performing the
function. *Cardiac Pacemakers Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002).

The function of this claim element has already been resolved. The Federal Circuit stated
that the function of "'switch means' is to select different memory locations, thereby enabling the
microprocessor to store transmitter identifiers in the memory locations." *Overhead Door Corp.*,
194 F.3d at 1273. It is equally clear from the court's decision that both Figures 2 and 3 serve as
the corresponding structure to the "memory selection second switch means" in claim 5. *Id.* ("The
district court erred in ruling that only the mechanical switch in Figure 2 is 'corresponding structure'
for the claimed 'switch means.' 'Switch Means,' when properly construed, also covers the software-
based embodiment described in Figure 3.")

As set forth above, Figure 3 depicts a flow chart with six functions: (1) validating newly
received transmitter codes four times and incrementing a counter; (2) checking each newly
received code against previously stored codes; (3) selecting a memory location for the newly
received code; (4) incrementing a code location pointer; (5) checking the value of the incremented
code location pointer; and (6) resetting the value of the incremented code location pointer.

The parties contest, however, how much of Figure 3 serves as the corresponding structure
of the "memory selection second switch means" claim element. Lynx argues that the Federal

---

[7]    Section 112, ¶ 6 provides:
An element in a claim for combination may be expressed as a means or step for
performing a specified function without the recital of structure, material, or acts in
support thereof, and such claim shall be construed to cover the corresponding
structure, material, or acts described  in the specification and equivalents thereof.
35 U.S.C. § 112, ¶ 6.

Circuit's statements should be interpreted literally to mean that Figure 3 and its six steps represent the corresponding structure of this means-plus-function claim element.[8] On the other hand, Chamberlain claims that Figure 3 depicts the patented invention in the program mode, (The `364 Patent, col. 4, lines 23-24), and that only a portion of Figure 3 represents the corresponding structure of the "memory selection second switch means." Specifically, Chamberlain claims that the two dialog boxes in the bottom right hand corner of Figure 3 represent the structure of the claim element. Although these dialog boxes represent steps 3 - 6 listed above, Chamberlain claims that only steps 3 and 4 are related to the memory selection second switch means element contained in claim 5.

In support of this interpretation, Chamberlain points out that when the Federal Circuit examined Figure 3, it specifically took note of these dialog boxes, and observed that these boxes "refer to storing the code at the location 'pointed to' by the 'code location pointer,' 'increment[ing]' the code location pointer, and 'loading' the code location pointer with a value of one." *Id.* at 1268-69. Based on this reference, Chamberlain argues that when the court makes reference to Figure 3 as the corresponding structure, in *Overhead Door Corp.*, it is actually referring to the two dialog boxes in the lower right hand corner of Figure 3.

In trying to decipher the proper corresponding structure, the court notes that 35 U.S.C. § 112, ¶ 6 "does not permit the limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim." *Globetrotter Software Inc. v. Elan Computer Groups, Inc.*, 236 F.3d 1363, 1367 (Fed. Cir. 2001) (citation omitted). The claim language of claim

---

[8]        Lynx also relies on a statement made by Rhyne during the prosecution the `703 Patent in support of this argument. According to Lynx, Rhyne stated that "[t]he actions of this software memory selection switch are fully described in Figures 3 and 4 . . . as well as at column 4, lines 31 through 68 . . . ." As stated previously, the court does not understand the relevance of statements made during the prosecution of the `703 Patent in construing the terms of the `364 Patent. Lynx itself has not explained why this information is relevant. Without a sufficient basis for considering Rhyne's statement, the court will not rely on it in construing the disputed claim term.

5 states that the "memory selection second switch means being adapted to select a first position at a time when a first one of said radio transmitters is energized . . . and . . . being adapted to select a second position at a time when a second one of said transmitter is energized." (The `364 Patent, col. 6, lines 18-26.) After reviewing Figure 3 and the claim language, the court finds that only steps 3 and 4 correspond to the function recited in claim 5. Therefore, the court will not adopt the notion that the entire structure of Figure 3 constitutes the corresponding structure because it also presents steps or functions not related to the claim language. The court finds in favor of Chamberlain's proposed construction: to the extent steps 3 and 4 are represented in the two dialog boxes in the lower right hand corner of Figure 3, these boxes will serve as the corresponding structure.

### C. "Decoder"

Claims 1 and 5 of the `364 Patent also contain a "decoder" element. Lynx maintains that as properly construed, "decoder" means a stand-alone device that takes a signal encoded in quaternary format and decodes that signal into binary format. Chamberlain disputes this construction, asserting that "decoder" means a "subsystem which can receive the output of the radio receiver and convert it into a form wherein the data contained in the received transmissions can be interpreted by the microprocessor." The disputed construction of "decoder" raises two issues: (1) is the term as properly construed a stand-alone device; and (2) is it is a device that decodes quaternary format into binary format.

### 1. Is the "decoder" a stand-alone device?

In Figure 2 of the `364 Patent, the patented invention is depicted in block form. As depicted in this drawing, the decoder device is a stand-alone or separate device from both the microprocessor and the receiver. In addition, the decoder device is identified in Figure 2 with the number 43. In referring to the decoder device in the written description of the patented invention,

the decoder device is regularly referred to as "decoder 43" in reference to the decoder as depicted in Figure 2. According to Lynx, Chamberlain has only referred to the decoder device in relation to Figure 2 as "decoder 43" and thus Chamberlain has defined the term by implication to be a stand-alone device. For example, in one instance, the specifications state, "[a]s illustrated in FIG. 2 the garage door operator includes a receiver 41 which has a suitable antenna 42 for receiving radio frequency transmission from the transmitters 26 and 28 and supplies an input to a decoder 43 which provides an output to a microprocessor unit 44." (The `364 Patent, col. 3, lines 1-5.) In addition to the language in the specifications, Lynx relies on the opinion of its expert, Gafford, who has opined that the term "decoder" as used in the `364 Patent means a stand-alone device. As stated above, however, whenever possible the court will rely primarily on intrinsic evidence for the proper construction of claim terms.

The court notes that the words "stand-alone device" are not used in the written description or claim language to define the decoder. On the contrary, the Summary of the Invention section of the `364 Patent states "[i]n the present invention the decoder module *in* the receiver will be capable of learning several different transmitter codes . . ." (The `364 Patent, col. 1, lines 54-55) (emphasis added). This statement contradicts Lynx's proposed claim construction that the decoder is a stand-alone device. Thus, the term decoder has been used in more than one manner and has not been defined by implication. *Bell Atlantic Network Services*, 262 F.3d at 1270 (a patentee will be found to have defined a term by implication if the "patentee uses a claim term throughout the entire specification, in a manner consistent with only a single meaning.") In addition, the court notes that although claims are to be "read in light of the specifications . . . limitations from the specifications are not be read into the claims." *Id.* The court concludes that the decoder is not required to be a stand-alone device.

**2.      Is the "decoder" limited to a device that decodes quaternary format into binary format?**

According to Lynx, in the `364 Patent, the inventors described a particular encoding/decoding scheme to be utilized by the invention. Specifically, Lynx claims that the decoder in the patented invention "takes a signal encoded in quaternary format and decodes that signal into binary format." (Lynx Memo, at 24.) Lynx cites a number of sources in support of this claim construction, but does not address how the Federal Circuit's decision in *Overhead Door Corp.* relates to this claim construction. Because the court finds the Federal Circuit's decision dispositive, the court does not need to address the parties' arguments at great length.

> In *Overhead Door Corp,* the Federal Circuit stated:
> The claims, however, do not require that the memory store the exact sequence of coded bits transmitted from the transmitter as its identifying signal. This reading of the claim language finds support in the written description, which explains that a code is associated with a transmitter. [The `364 Patent] does not describe any particular format, encryption, or alteration in transmitted and stored codes.

194 F.3d at 1274-75. The Federal Circuit's observation that the `364 Patent does not describe any particular format militates against imposition of the additional claim limitations proposed by Lynx.

The court will, instead, adopt what it believes is the ordinary meaning of the term "decoder." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 n.1 (Fed. Cir. 2001). In determining this ordinary meaning, the court notes that both parties have claimed that their construction comports with the Institute of Electrical and Electronics Engineers (IEEE) definition of "decode" which is "[t]o recover the original message from a coded form of the message." (IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS, at 231.) The court will rely on this agreed definition in construing this claim. *Interactive Gift Express Inc.,* 256 F.3d at 1332 n.1 ("[d]ictionaries, which are a form of extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence"). Because the court finds that Chamberlain's proposed claim construction most closely conforms with the ordinary meaning, the court adopts its

proposed construction: "a subsystem which can receive the output of the radio receiver and convert it into a form wherein the data contained in the received transmissions can be interpreted by the microprocessor."

## III.    INFRINGEMENT

Having determined the proper construction of the disputed claim terms, the court now addresses whether or not the accused Lynx garage door opener infringes claims 1 and 5 of the `364 Patent. In order to demonstrate infringement, a patentee must prove that the accused product contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001); *Seal-Flex, Inc. v. Athletic Track and Court Const.,* 172 F.3d 836, 842 (Fed.Cir.1999). Any deviation from the claim precludes such a finding. *Cole v. Kimberly-Clark Corp.,* 102 F.3d 524, 532 (Fed. Cir.1996).

As stated previously, both parties seek summary judgment on this issue. In considering both motions, the court will construe the facts most favorably to each side on the other side's motion. Lynx has denied infringement based on four claim elements in the `364 Patent: (A) "code"; (B) "memory selection switch" (C) "decoder" and (D) "memory selection second switch means." Chamberlain, on the other hand, argues that the Lynx garage door opener infringes all claim elements in claims 1 and 5 of the `364 Patent, including the disputed terms.

### A.    "Code"

As stated above, Lynx claims that the term "code" as properly construed means newly received code and not previously stored codes. The patented invention only stores newly received codes in different locations, Lynx argues; thus the accused device does not infringe claims 1 and 5 because it stores new codes in the same location each time. This argument is premised, however, on an improper construction of the claim term. This court has determined that the proper

claim construction for the term code is "the identity codes of the transmitters." Lynx does not dispute that the accused device utilizes transmitters that contain identity codes. Thus, a jury could find that this claim term is literally infringed by the Lynx garage door opener. The mere fact that one claim term is infringed, however, does not require a finding of infringement as to the entire claim. *Bai v. L&L Wings Inc.*, 160 F.3d 1350, 1353-54 (Fed. Cir. 1998).

## B. "Memory Selection Switch"

### 1. Literal Infringement

Both sides agree regarding the proper construction of this term: a mechanical switch with different positions, each position corresponding to a different location in memory, thus enabling the garage door opener to store codes in different locations. The parties also agree that the Lynx garage door opener does not contain a mechanical memory selection switch. (Lynx Memo, at 33; Chamberlain Memo, at 15; Chamberlain Reply Brief, at 11.) Thus, there can be no literal infringement. *Southwall*, 54 F.3d at 1575 (literal infringement requires that "every limitation set forth in a claim must be found in an accused product, exactly.") (citation omitted).

### 2. Doctrine of Equivalents

Even though Lynx's accused garage door opener does not literally infringe claim 1 of the '364 Patent, it may still infringe under the doctrine of equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). In its brief, Lynx has combined the arguments regarding how the doctrine of equivalents applies to the "memory selection switch" of claim 1 and the "memory selection second switch means" of claim 5. To the extent the court can separate these two arguments, it will independently address infringement as to claims 1 and 5.

An accused product infringes a patent under the doctrine of equivalents "only if 'insubstantial differences' distinguish the missing claim element from the corresponding aspect of the accused device." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997)

(citation omitted). Before considering the application of the doctrine, however, the court must consider whether infringement under the doctrine of equivalents is precluded by: (a) the "all elements" rule, or (b) prosecution history estoppel. *Bell Atlantic Network Services,* 262 F.3d at 1267.

### (a) "All Elements" Rule

The court, first, considers the application of the "all elements" rule. The "all elements" rule requires that an accused device "must contain every claimed element of the invention or the equivalent of every claimed element." *Kustom Signals,* 264 F.3d at 1333, citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29 (1997). "No claimed element, or an equivalent thereof, can be absent if the doctrine of equivalents is invoked." *Id.*

Lynx argues that Chamberlain is attempting to erase a claim element, the memory selection switch, in seeking infringement under the doctrine of equivalents, in violation of the "all elements" rule. Claim 1 states: "a memory selection switch . . . setable in a first position . . .so that the code of said first transmitter will be stored in said memory means and said memory selection switch setable in a second position . . . so that the code of said second transmitter will be stored in said memory means." (The `364 Patent, col.5, lines 24-31.) According to Lynx, the accused device does not operate to store a first transmitter code in a first location and then to store a second transmitter code in a second location, but instead stores new codes in the same location every time. (Gafford Decl. ¶¶ 12-17.) Chamberlain claims that it is not erasing the memory selection switch claim element in seeking infringement under the doctrine of equivalents because the pointer value in the Lynx garage door opener performs the same function as the memory selection switch, by selecting memory locations during the learning process. (Rhyne Decl. ¶ 17.) This pointer value, according to Chamberlain, also permits the accused device to store codes in different memory locations. (*Id.*)

Lynx cites two cases in which the Federal Circuit held the doctrine of equivalents was not applicable due to the "all elements" rule. In *Cooper Cameron Corp. v. Kvaerner Oil Field Products, Inc.,* 291 F.3d 1317, 1318-19 (Fed. Cir. 2002), the Federal Circuit considered the application of the "all elements" rule to claim elements in two patents describing "subsea wellheads having a horizontal spool tree arrangement that protects the integrity of the well during 'workover' activities for repair and maintenance." In one of the claims, the patentee stated that a "workover port" is located "between the two plugs." The accused device's "workover port" was located "above" the plugs and the court found as a matter of law that the accused device could not be equivalent to the patentee's claim because it would require disregarding a material claim limitation. *Id.*

Similarly, in *Sage Products,* 126 F.3d 1420, the court considered the application of the "all elements" rule to a patent relating to "containers for disposing of hazardous medical waste." *Id.* at 1422. The patent described a container that had an "elongated slot at the top of the container." *Id.* The patentee argued that an accused device that included an "elongated slot" within the container bottom infringed the patent under the doctrine of equivalents. *Id.* at 1424. The Federal Circuit disagreed, because the slots were in different locations and the doctrine of equivalents did not permit the patentee to remove a limitation from the disputed claim. *Id.*

Contrary to these two cases, the court concludes here that the language of claim 1 regarding the memory selection switch does not include limitations inconsistent with the operation of the Lynx garage door opener. Lynx relies on its expert, Gafford, who states that the Lynx garage door opener does not have a memory selection switch of any kind because the accused device always stores transmitter codes in the same location. (Gafford Decl. ¶ 14.) This opinion is contradicted by Chamberlain's expert, who states that the pointer value of the accused device serves the same function as the memory selection switch. (Rhyne Decl. ¶ 20.) The court notes that the "all elements" rule does not require that the literal words be present but instead only requires the equivalent of the element. *Sage Prods. Inc.,* 126 F.3d at 1423 ("a claim element is

equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device.") With this standard in mind, given the conflicting opinions regarding the presence of a memory selection switch or its equivalent, the court can not state as a matter of law that Chamberlain is attempting to disregard an element of claim 1 by applying the doctrine of equivalents. Thus, the "all elements" rule does not preclude the court from applying the doctrine of equivalents.

### (b)    Patent History Estoppel

Lynx argues, next, that the doctrine of equivalents is not available to Chamberlain as a matter of law because it is barred by the doctrine of prosecution history estoppel. "Prosecution history estoppel precludes a patentee from obtaining in an infringement suit patent protection for subject matter which it relinquished during prosecution in order to obtain allowance of the claims." *Mark I Marketing Corp. v. R.R. Donnelly & Sons Co,* 66 F.3d 285 (Fed. Cir.1995); *see also Warner-Jenkinson,* 520 U.S. at 31-32. "An estoppel may arise as a result of amendments that narrow the scope of a claim to satisfy any requirement of the Patent Act." *Allen Engineering Corp. v . Bartell Industries, Inc.,* 299 F.3d 1336, 1349 (Fed. Cir. 2002) (citation omitted).

Lynx claims that as originally drafted, claim 1 of the `118 Patent included both a software and mechanical memory selection switch. Claim 1 was later rejected by the Patent and Trademark Office (PTO) and according to Lynx, Chamberlain amended claim 1 to include only a mechanical switch, for the purposes of patentability. Because Chamberlain abandoned the software embodiment for the purposes of patentability, Lynx argues, it can not be permitted to reclaim this embodiment through the doctrine of equivalents. Chamberlain asserts that patent history estoppel does not apply because the scope of claim 1 was limited to a mechanical switch both before and after claim 1 was amended.

In analyzing whether prosecution history estoppel applies in this case, the court must first

33

determine which claim limitations are alleged to be met by equivalents. *Abbott Laboratories v. Dey, L.P.*, 287 F.3d 1097, 1103 (Fed. Cir. 2002). There is no dispute that Chamberlain is seeking infringement under the doctrine of equivalents in relation to the memory selection switch claim element in claim 1.

Second, the court "must determine whether the limitations at issue were amended during prosecution of the patent." *Id.* If these limitations were not amended, "amendment-based estoppel will not bar the application of the doctrine of equivalents." *Id.* The parties have not included the facts related to the amendment of the `118 Patent in their 56.1 Statements, thus, the court relies on the record alone to determine the facts related to this argument.

On October 29, 1985, Chamberlain filed application number 792661, the parent application to the `118 Patent, with the PTO. (Patent Application Number 792661, Ex. P to Lynx's 56.1, at LX 5278.) Claim 1 in this application stated:

> A garage door operator for a garage door comprising, a garage door operation to open and close it, a radio receiver, a decoder connected to receive the output of said radio receiver, . . . a memory selection switch connected to said microprocessor, a plurality of radio transmitters with different codes and when the memory selection switch is in a first position and a first one of said radio transmitter is energized, the code of said first transmitter will be stored in said memory means and when said memory selection switch is in a second position and a second one of said radio transmitters is energized the code of said second transmitter will be stored in said memory means and when said microprocessor is placed in the operate mode either or both of said first and second radio transmitters when energized cause said microprocessor to energize said garage door operator mechanism.

(*Id.* at LX 5287).

On April 3, 1987, claims 1-4 of this application were rejected by the PTO. (April 3, 1987 Letter from PTO to Chamberlain, Ex. P to Lynx's 56.1, at LX 5298.) Chamberlain argues that claims 1-4 were rejected by the PTO as "being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." (Chamberlain's Memo,

at 34.) Chamberlain conspicuously avoids the fact, however, that the PTO also rejected claims 1-4 "under 35 U.S.C. § 103 as being unpatentable over Liotine *et al.* taken in combination with Mallory."[9] (April 3, 1987 Letter from PTO to Chamberlain, Ex. P to Lynx's 56.1, at LX 5300.) Pursuant to 35 U.S.C. § 103, the PTO will reject a patent application if the subject matter is obvious at the time of the invention in relation to the prior art. 35 U.S.C. § 103(a). The PTO letter described the Liotine and Mallory patents, stating, "while Liotine *et al.* suggest the use of plural transmitters . . .no details are provided of the storing of different codes associated with each transmitters in the receiver memory. However, Mallory discloses a plural transmitter system in which codes associated with each transmitter are stored in a receiver memory associated with a central monitor . . . ." (April 3, 1987 Letter from PTO to Chamberlain, Ex. P to Lynx's 56.1, at LX 5300.)

On July 1, 1987, Chamberlain directed a letter to the PTO in which it amended claim 1 in response to the rejection of claims 1-4. (July 1, 1987 Letter to PTO, Ex. P to Lynx's 56.1, at LX 5302.) Chamberlain amended claim 1 to read:

> A garage door operator for a garage door comprising, a garage door operation mechanism with an output shaft connected to said garage door . . . a [program or operate] first switch movable between program and operate positions connected to said microprocessor to place said microprocessor in the operate or program mode, a memory means for storing a plurality of addresses connected to said microprocessor when said first switch is in the program position, a memory selection switch connected to said microprocessor, a plurality of radio transmitters with different codes [and when the] said memory selection switch [is] setable in a first position [and] at a time when a first one of said radio transmitters is energized [,] so

---

[9]    35 U.S.C. §103 states:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
35 U.S.C. § 103.

<u>that</u> the code of said first transmitter will be stored in said memory means and [when] said memory selection switch [is] <u>setable</u> in a second position [and] <u>at a time when</u> a second one of said radio transmitters is energized <u>so that</u> the code of said transmitter will be stored in said memory means and [when] said microprocessor [is] placed in the operate mode <u>when said first switch is in the operate position so that</u> either or both of said first and second radio transmitters when energized cause said microprocessor to energize said garage door operator mechanism.

(*Id.* at LX 5302-5303) (bracketed terms were removed and underlined terms were added.)   In the July 1, 1987 letter, Chamberlain acknowledged that claims 1-4 were rejected as obvious given the Liotine *et al* and Mallory patents. (*Id.* at LX 5303.)   Chamberlain stated that the amended claim makes clear that the invention was not made obvious by Liotine. As amended, the claim provides for distinctive codes that are then stored in the receiver, while the Liotine patent describes a system by which the receiver sends new codes to the transmitters. (*Id.* at LX 5305.)   More critical to the court's review are the statements made by Chamberlain regarding the Mallory patent. Chamberlain asserted that its invention was not obvious given the Mallory patent because that patent "requires a keyboard and a data storing means." (*Id.*)   Chamberlain went on to state that:

It is to be noted that the present invention does not require a keyboard, but that the storing of the codes of the individual transmitters is automatic and occurs merely by moving the switch . . . to the program mode and moving the [mechanical memory selection switch] to different individual positions corresponding to each individual transmitter which will store in the positions of the receivers memory corresponding to the position . . ., the unique code of a particular transmitter. On the other hand, Mallory device requires the use of a keyboard and display . . . so as to enter the required information.

(*Id.*)

Chamberlain's amended claim 1 was later rejected by the PTO on September 28, 1987, for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. (*Id.* at LX 5308.) On an undetermined date, Chamberlain responded to PTO's rejection and made minor changes to the wording of claim 1, which issued with essentially the same language as the July 1, 1987 amendment.   (*Id.* at LX 5311.)

Based on the wording of the amendment and Chamberlain's characterization of the

amendment in the July 1, 1987 letter, Lynx argues that claim 1, as originally written, covered both a software and mechanical memory selection switch. Lynx further claims that in response to the PTO's rejection, Chamberlain narrowed the claim to include only mechanical switches, for the purpose of making the invention patentable over prior art, triggering prosecution history estoppel. Chamberlain argues instead that the scope of claim 1 originally included a mechanical switch without a software embodiment. The court agrees.

The portions of the patent history set forth above regarding the PTO's rejection of claim 1 demonstrate that this rejection was based on patentability. Specifically, the PTO stated that it was rejecting claims 1-4 because the subject matter was obvious based on the prior art. The court does not find support in the record, however, for Lynx's argument that Chamberlain abandoned the software embodiment to obtain the patent. The original claim 1 envisioned a memory selection switch connected to the said microprocessor, which was the same language used in the amended claim. This language provides some indication that the patentee envisioned a mechanical switch. Although the court agrees that the language in the amended claim 1 provides added clarity that it refers to a physical switch, there is no indication that the original claim also included a software embodiment. Furthermore, the statements made by Chamberlain in the July 1, 1987 letter do not relate to a software embodiment of the memory selection switch. Instead, it appears that Chamberlain was distinguishing the mechanical memory selection switch method of storing codes into memory from the prior art. After reviewing the record, the court agrees with Chamberlain and finds that the scope of claim 1 did not include a software embodiment that was later abandoned. Thus, the court does not find that patent history estoppel bars the application of the doctrine of equivalents.

### (c) Application of the Doctrine of Equivalents

Finding that the "all elements" rule and prosecution history estoppel do not bar use of the

doctrine of equivalents, the court will now consider whether the '364 patent is infringed under that doctrine. An accused device is an equivalent that infringes a patented invention if it (1) performs substantially the same overall function or work, (2) in substantially the same way, (3) to obtain substantially the same overall result as the claimed invention. *Valmont Industries, Inc., v. Reinke Manufacturing Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993). "An element in the accused product is equivalent to a claim element if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Overhead Door Corp.*, 194 F.3d at 1269, citing *Warner-Jenkinson*, 520 U.S. at 39-40.

The claim term memory selection switch has been construed to mean "a mechanical switch with different positions, each position corresponding to a different location in memory, thus enabling the garage door operator to store codes in different memory locations." *Id.* at 1269. The fact that Lynx's accused device utilizes software and does not include a mechanical switch to store codes does not make the two substantially different. In *Overhead Door Corp.*, 194 F.3d at 1269, the court reversed the district court's grant of summary judgment as to claim 1 under the doctrine of equivalents because there was a genuine issue of fact regarding whether a mechanical and software system used to save codes are interchangeable substitutes. *Id.* at 1270. In determining a genuine issue of fact existed regarding claim 1, the court relied on the statement in the declaration of Rhyne that the use of a "software pointer for a microprocessor versus a hardware switch to control a microprocessor-based system is just a matter of design choice." *Id.* The court found that Rhyne's declaration and "his supporting citations to computer science literature show a genuine issue of material fact precluding summary judgment." *Id.* Here, similarly, this court will not find a substantial difference simply because the Lynx garage door opener does not utilize a mechanical switch.

Lynx also claims that the accused device stores codes in a substantially different manner

than the memory selection switch of claim 1. According to Gafford, the Lynx garage door opener is substantially different because it stores new codes in the same location every time and thus does not contain a switch function of any kind, to select different memory locations. (Gafford Decl. ¶¶ 15-18.) Rhyne contradicts this opinion, stating that Lynx's garage door opener has a pointer value "to select memory locations" during the learning process and thus it "performs exactly the function of the memory selection switch." (Rhyne Decl. ¶17.)

Given these vastly different views, the court is unable to find the absence of any genuine issue of material fact, warranting summary judgment for either party. The two retained experts do not even agree as to whether or not the accused product contains a pointer value. (Gafford Decl. ¶ 17; Rhyne Decl. ¶ 16.) Because the court will draw every reasonable inference in favor of the non-moving party, the court finds that both parties' motions must be denied. There is a genuine issue of material fact remaining whether or not the Lynx garage door opener utilizes an equivalent to the memory selection switch.

### C. "Decoder"

The court has determined that the proper claim construction of decoder is a "subsystem which can receive the output of the radio receiver and convert it into a form wherein the data contained in the received transmissions be interpreted by the microprocessor." This construction applies to the decoder element in claims 1 and 5.

Lynx argues, first, that there can be no literal infringement because the accused device does not contain a stand-alone decoder that converts codes from binary form into a quaternary format. The court notes that these arguments are based on a flawed claim construction. As set forth above, the court has stated that the decoder element does not require these additional limitations. Gafford is unclear regarding whether or not the Lynx garage door opener has a decoder at all or merely lacks a "stand alone" decoder that converts binary code to a quaternary

format.  There is some evidence that the accused device does not utilize a decoder of any kind. (Gafford Second Supplemental Declaration, Ex. J to Lynx's 56.1 ¶ 8.) Specifically, Gafford stated that the when the accused device "receives a transmitted code, the transmitted code is received by a radio frequency demodulator.  The output of this demodulator is directly connected to a CPU, not a separate and independent decoder device." (*Id.*) Chamberlain disputes this assertion and argues that the accused device does in fact contain a decoder.  The decoder function, according to Rhyne, is performed by an "operational amplifier" device, which converts an amplified analog signal into a digital form.  (Rhyne Supplemental Declaration, Ex. 9 to Chamberlain's 56.1 ¶ 15-16.)

Similar to the court's analysis of the memory selection switch claim element, the court is unwilling to choose between the two expert opinions, each of which is based upon facts in the record.  Gafford and Rhyne have contradicted one another regarding the existence and function of a decoder device.  Their conflicting testimony satisfies the court that there is a genuine issue of material fact regarding infringement literally and under the doctrine of equivalents.

### D.    "Memory Selection Second Switch Means"

#### 1.    Literal Infringement

As stated previously, this claim term was written in means-plus-function language.  While the parties have argued literal infringement of this claim element, they have failed to discuss the applicable law.  The court must follow a two-step process in examining whether a claim containing a means-plus-function element has been literally infringed: (a) the accused device must perform the identical function in the means clause; and (b) the accused device must perform this function with structure that is the same or equivalent to that disclosed in the specifications.  *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1997); *Valmont Industries, Inc. v. Reinke Mfg. Co.*, 983 F.3d 1039, 1042 (Fed. Cir. 1993).  Even though this two-step procedure for determining literal infringement of a means-plus-function element was set out in *Overhead Door*

*Corp.*, 194 F.3d at 1273, the parties fail to discuss whether the patented invention and the accused device serve the identical function.

The function of the memory selection second switch means is to select different memory locations, thereby enabling the microprocessor to store transmitter identifiers in the memory locations. As stated previously, the parties' experts have vastly different views on whether the accused device utilizes a pointer value during the code storage process. Specifically, Rhyne stated that the pointer value of the Lynx garage door opener selects a first position when a first transmitter is stored and a second different position when a second transmitter is to be stored. (Rhyne Decl. ¶ 34.) Lynx for its part denies that its device has a pointer that selects memory locations. (Gafford Decl. ¶ 17.) The contrasting opinions of the parties' retained experts raise a genuine issue of fact as to whether the two devices serve identical functions. Thus, the court will deny both parties' motions related to infringement of this claim element.

The court considers, next, whether the corresponding structures of the claim element are infringed by the accused device. The court notes that the Federal Circuit determined that when properly construed, the "memory selection second switch means" covers the software based embodiment in Figure 3 and the mechanical switch in Figure 2. Lynx appears to disregard this determination, and instead addresses infringement exclusively in the context of Figure 3.

Chamberlain does not contend that the accused device contains the identical structure disclosed in Figure 3. The parties' arguments instead relate to whether or not the structure of the claim element is equivalent. "A structure in an accused device is equivalent to the disclosed structure corresponding to a means-plus-function element if it is insubstantially different from the disclosed structure." *Overhead Door Corp.*, 194 F.3d at 1273, citing *Chiuminatta Concrete Concepts v. Cardinal Industries, Inc.*, 145 F.3d 1303,1309 (Fed. Cir. 1998). In disputing whether or not the accused device utilizes an equivalent structure, the parties restate their arguments

41

regarding claim construction. Lynx argues that because all six elements of Figure 3 constitute the corresponding structure, the two structures are not equivalent. The court has already rejected this argument and instead determined that the corresponding structure is reflected in steps 3 and 4 of Figure 3: the selection of a memory location and incrementing the pointer.

As stated above, Chamberlain claims that the structures are equivalent because they both utilize a stack structure with a code location pointer to store codes into memory. (Rhyne Decl. ¶ 29.) Rhyne explained that in his opinion, "the stacking procedure disclosed in the `364 patent and that used in the [accused device] are well known equivalents. In the `364 Patent the stack is 'pushed' by incrementing the code location pointer while keeping the stored transmitter codes in place. In the [accused device] the stack is 'pushed' by moving the stored codes to higher addresses and storing the new code at the lowest address." (*Id*. ¶ 30.) Gafford, on the other hand, stated the accused device does not have a code location pointer or memory selection switch of any kind. (Gafford Decl. ¶ 13.) Instead, according to Gafford, new codes are stored in the same location each time in the accused device and old codes are copied to higher memory locations. (*Id*. ¶ 9.) Based on these conflicting accounts of the two devices the court finds there is a genuine issue of material fact regarding infringement that precludes granting summary judgment.

As stated previously, Figure 2 is also a corresponding structure to the memory selection second switch means and the court must consider whether it is an equivalent structure to that used by the Lynx garage door opener. Lynx has not addressed whether Figure 2 is an equivalent structure. The court notes, further, that issues relevant to the equivalency of the mechanical switch depicted in Figure 2 and the accused device have already been addressed in the court's discussion of the memory selection switch of claim 1, which covers a mechanical switch. As stated previously, the court determined that genuine issues of material fact exist regarding whether or not the Lynx garage door opener operates in an equivalent manner to that of the mechanical memory selection

switch. For the same reasons, the court finds a genuine issue of material fact exists regarding whether the structure of the mechanical memory selection switch, depicted in Figure 2, is equivalent to the accused device.

### 2. Doctrine of Equivalents[10]

Determining whether there is infringement under the doctrine of equivalents is a three-step test. An accused device is an equivalent if it (1) performs substantially the same overall function or work, (2) in substantially the same way, and (3) to obtain substantially the same overall result as the claimed invention. *Valmont Industries, Inc,* 983 F.2d at 1043. The doctrine of equivalents serves to prevent an infringer from evading patent claim by making insubstantial changes. *Charles Greiner & Co. v. Mari-Med Mfg., Inc.,* 962 F.2d 1031, 1036 (Fed. Cir. 1992).

As stated above, the parties have relied on expert testimony which provides conflicting views of how the accused device and patented invention operate. The court declines to chose between two reasonable but conflicting interpretations of the facts. Instead, the court finds that genuine issues of fact exist regarding the equivalency of the patented invention and the accused device.

### CONCLUSION

Based on the court's construction of the disputed claim elements, the court concludes that

---

[10] The court notes that Lynx argues again that Chamberlain is precluded from seeking infringement under the doctrine of equivalents because of the "all elements" rule and prosecution history estoppel. The court notes, first, that Lynx's argument pertaining to the "all elements" rule is the same as addressed above; to apply the doctrine of equivalents to the accused device would eliminate the memory selection switch claim element which selects different memory locations for storing codes. The court has already considered and rejected this argument in relation to claim 1. For the same reasons, the court rejects the argument here. The court notes, further, that Lynx argues that because prosecution history estoppel applies to claim 1, it also applies to claim 5. The court does not need to address this argument, however, because it has already determined that the doctrine does not apply to claim 1 and therefore, can not apply to claim 5.

there are genuine issues of material fact regarding infringement of the 364 Patent. As a result, Lynx's motion for summary judgment of non-infringement (Doc. No. 87-1) is denied, and Chamberlain's cross-motion of infringement (Doc. No. 93-1) is also denied.

ENTER:

Dated: March 31, 2003

REBECCA R. PALLMEYER
United States District Judge



FIG. 2

LX 0003



FIG. 3